**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF PENNSYLVANIA ex rel. ALISHA ALEJANDRO, <br><br> *Plaintiffs/Relator,* <br><br> v. <br><br> PHILADELPHIA VISION CENTER, BARCO OPTICAL, INC., BRUCE RUBIN, AND DR. BETH BROOKS, <br><br> *Defendants.* | CIVIL ACTION <br> NO. 20-2027 |

**PAPPERT, J.**                                                                                                   **July 20, 2021**

**<u>MEMORANDUM</u>**

Relator Alisha Alejandro contends she discovered a scheme by Philadelphia Vision Center, Barco Optical, Inc., Bruce Rubin and Dr. Beth Brooks to submit to government healthcare programs false claims for eye exams. She sued them on behalf of the United States under the False Claims Act's *qui tam* provisions, 31 U.S.C. § 3279, *et seq.*[1] The Defendants move for judgment on the pleadings, asserting that Alejandro's Complaint fails to state a claim. The Court grants their motion because Alejandro has not alleged facts sufficient to show the alleged scheme was material to any decision to pay the claims.

---

[1] A private plaintiff like Alejandro – a relator – may bring a civil action to enforce the FCA on behalf of the United States and may receive a share of any recovery resulting from the action. *See* 31 U.S.C. § 3730(b) &(d). After she filed this action (ECF 1), the Government declined to intervene. (ECF 2.) The relator has "the right to conduct the action" where the Government declines intervention. *Id.* § 3730(c)(3). While it declined to intervene, the Government subsequently filed a statement of interest in response to Defendants' motion focused solely on the FCA's knowledge requirement. (*See* Gov't Stmt. of Interest, ECF 36 at 2.) It "takes no position on the facts alleged in the pleadings or the fact-based issues raised in the parties' briefing." (*Id.*)

I

A

Alejandro was Philadelphia Vision Center's patient from 2009 through 2016. (Compl., ECF 1, ¶ 16.) Barco Optical, Inc. is Philadelphia Vision Center's alleged owner, Dr. Brooks is a licensed optometrist who "is an independent contractor working for Vision Center and other locations" and Rubin is Barco's owner. (Id. ¶¶ 18-20.) Alejandro alleges Rubin submitted claims for Medicare/Medicaid reimbursements under Dr. Brooks' National Provider Identifier (NPI) numbers even when care was provided by another optometrist. (Id. ¶¶ 41-52.) Specifically, she alleges Dr. Johnson examined her eyes on December 8, 2016 and, although Dr. Brooks "was not present at the Vision Center" that day, Barco submitted a request for Medicare/Medicaid payment or reimbursement using Dr. Brooks' NPI number. (Id. ¶¶ 39-41, 44.)

Defendants did not directly bill Medicaid for services rendered to Alejandro. (Amended Answer, ECF 21, ¶ 45.) Instead, Barco submitted a claim to Alejandro's vision plan, Superior Vision Benefit MGT. When it did so, Barco admittedly used Dr. Brooks' NPI number instead of Dr. Johnson's. (Am. Answer, ECF 21, ¶ 41.) On February 16, 2017, Superior Vision, referencing Dr. Brooks' NPI number, paid the claim for Alejandro's visit. (Compl., ECF 1, ¶ 43; Amended Answer, ECF 21, ¶ 43.) According to Rubin, under a contract with Superior Vision, "payments are made in a fixed amount to Barco Optical, Inc. regardless of which doctor renders the service" and "neither [Alejandro] nor the vision plan sustained any financial loss" from the use of Dr. Brooks' NPI number instead of Dr. Johnson's. (Compl., ECF 1, ¶ 62.)

Alejandro alleges Defendants, "for years for multiple patients and on [a] regular

basis" submitted bills under the NPI number for Dr. Brooks or Dr. Stuart Pollock "for services not performed by them." (*Id.* ¶¶ 45, 47-48.) Rubin admits he used a single NPI number to submit reimbursement requests to Superior Vision even if the submitted NPI number did not correspond to the optometrist who saw a particular patient because it was "much more simple to keep it all under one NPI number." (*Id.* ¶ 49.) So, when he did "the billing, whether it's Dr. Johnson or Dr. Brooks . . . . everything [wa]s billed under one account." (*Id.* ¶ 50.) Although Alejandro conclusorily alleges that "Defendants have retained unlawful payments resulting from improper, false and fraudulent payment requests," she does not allege facts to show Defendants ever billed for services that were not provided or for services provided by an optometrist with an expired license or by anyone who was unlicensed. (*Id.* ¶ 56.) All the claims Defendants submitted for payment to a third-party for eye examinations "were for actual examinations . . . by one of the optometrists [who] provided services as independent contractors for Barco Optical, Inc." (Amended Answer, ECF 21, ¶ 49.)

      Defendants contend that during a prior civil suit brought by Alejandro, her attorney "threatened to put Rubin in jail" and to put him out of business. (Amended Answer, ECF 21, ¶ 2.) In April 2018, during discovery in that case, Rubin emailed Superior Vision to explain he had "been billing services under Dr. Brooks as it is more efficient" but said in the future he would log out and log back in "to separate the claims for each doctor's exams." (Compl., ECF 1, ¶ 54.) He asked whether Superior Vision required him to do so and sought "any written guidelines . . . to explain exactly how the billing should be done." (*Id.*) He also told Superior "it would be a great help" if it could prepare a letter showing its awareness of his billing practices and stating it did not

3

"intend to pursue criminal charges against" him. (*Id.*) In an August 2018 affidavit prepared for the other case, Rubin stated Superior had taken no adverse action after he notified it of his billing practices. (Compl., ECF 1, ¶ ¶ 62.) Instead, it offered "retraining on billing procedures to ensure that the correct coding was done on future submissions." (*Id.* (internal quotation omitted).)

B

Alejandro alleges in Count I that the Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A). (*Id.* ¶ 70.) In Count III – there is no Count II – she alleges the Defendants conspired with each other to commit acts in violation of 31 U.S.C. § 3729(a)(1)(A) and (B)[2] and (G). (*Id.* ¶ 79.) In Count IV, she asserts an FCA claim for "reverse false claims", that is, that the Defendants concealed, avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G). (*Id.* ¶ 83.)

II

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). When considering a Rule 12(c) motion, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). Rule 12(h)(2)(B) permits a Rule 12(c) motion to raise a defense of failure to state a claim upon which relief can be granted, as Defendants' motion does. Fed. R. Civ. P. 12(h)(2)(B). (*See*

---

[2] Alejandro does not allege a separate claim under 31 U.S.C. § 3729(a)(1)(B).

Defs.' Mot. for J. on Pleadings, ECF 27, 8-10.) The Court accordingly reviews the motion under the same standards as a Rule 12(b)(6) motion to dismiss. *See Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991).

To withstand a Rule 12(b)(6) dismissal, Alejandro's Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). FCA *qui tam* actions must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b). *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014). To satisfy Rule 9(b), an FCA claimant must "allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). "Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, "describing a mere opportunity for fraud will not suffice." *United States v. Omnicare, Inc.*, 903 F.3d 78, 91 (3d Cir. 2018).

III

"The FCA is meant 'to reach all types of fraud . . . that might result in financial loss to the Government.'" *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003)). But it "is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 (2016). The law is not intended to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel.*

5

*Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (citation omitted). Four elements are required to state an FCA violation: "falsity, causation, knowledge, and materiality." *Petratos*, 855 F.3d at 487. The Court need not decide whether Alejandro's Complaint satisfies any of the first three because it does not sufficiently allege materiality.

A

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct. at 2002. Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (alteration in original). A misrepresentation is material if it "goes 'to the very essence of the bargain.'" *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 136 S. Ct. at 2003 n.5).

"The materiality standard is demanding. The False Claims Act is not 'an all-purpose anti-fraud statute,' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). An FCA materiality inquiry "is a holistic, totality-of-the-circumstances examination of whether the false statement has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, --- F.4th ----, No. 20-1922, 2021 WL 2933212, at *18 (3d Cir. July 13, 2021) (quoting 31 U.S.C. § 3729(b)(4)).

Alejandro defines the submission of a claim for physician services under the NPI

6

number of a doctor who did not perform these services as a "misleading half-truth" and equates accuracy with materiality. (Pl.'s Resp., ECF 33 at 7 (citing *Escobar*, 136 S. Ct. at 2001).) She contends 42 C.F.R. § 455.440 requires claims to "contain the NPI of the physician who rendered the item or service" and 55 Pa. Code § 1147.51 requires optometric services to "be billed in the name of the optometrist providing the service." (*Id.* at 5.) Even so, however, "the Government's designation of compliance with a particular regulatory requirement as a condition of payment is . . . not dispositive of[ ] materiality." *Int'l Bhd. of Elec. Workers Loc. Union No. 98*, 2021 WL 2933212, at *19 (3d Cir. July 13, 2021).

The Complaint fails to allege facts which could plausibly show that the relevant claims would not have been paid if the correct NPI number, as opposed to that of a different optometrist, had been used instead. Alejandro has not alleged the Government paid for any services that were not provided or for services provided by an unlicensed professional.[3] Those omissions preclude Alejandro from sufficiently alleging materiality. While Rubin's use of a single NPI number to submit claims was perhaps sloppy, lazy or even wrong, nothing suggests "Congress intended conduct such as this to morph into an actionable fraud against the government." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 765 (3d Cir. 2017). Accepting Alejandro's allegations as true, the submissions "did not influence the 'payment or receipt of money.'" *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 822 (N.D. Ill. 2015) (quoting 31 U.S.C. § 3729(b)(4) (emphasis omitted)).

---

[3]   She alleges she received her eye examination and prescription from a licensed optometrist. (Compl., ECF 1, ¶¶ 39-40.)

Any minor or insubstantial noncompliance cannot be "material." *Escobar*, 136 S. Ct. at 2003. Thus, in *Spay*, the Third Circuit held the use of "dummy Prescriber IDs" to submit prescription claims did not sufficiently allege materiality where the dummy IDs "were intended as a technical, formulaic way of preventing a computer program from denying legitimate claims for reimbursement and payment for prescriptions that were actually disbursed to Medicare recipients" and "[t]he claims themselves were neither false nor fraudulent." 875 F.3d at 765 (3d Cir. 2017). Confronted with similar allegations in *Rockey*, the court found the relator's claims "founder[ed] on materiality." *Id.* She alleged the defendant submitted claims for audiologists' services using a physician's NPI, but the claims were "limited to those for which Medicare would have reimbursed the Ear Institute even if the audiologists' NPIs had been listed on the claims forms." *Id.* The claims' alleged falsity "was not material" "because the government would have paid [them] regardless of whose NPI was on the form."[4] *Id.*

In contrast, in *United States v. Mount Sinai Hospital*, the court found the relator's allegations of "doctor swapping" were material where the complaint alleged "the doctors who rendered the medical treatment in at least six of the 'doctor-swapping' examples were not eligible to bill Medicare." No. 13-4735, 2015 WL 7076092, at *11 (S.D.N.Y. Nov. 9, 2015). "Swapping the name of an eligible doctor for an ineligible one would have a natural tendency to influence, or be capable of influencing, the payment or receipt of money." *Id.* (citation and internal quotation omitted). While Alejandro's

---

[4]   In her Reply, Alejandro attempts to distinguish *Rockey* by arguing audiologists are not treated as "physicians" under Medicare billing guidelines, while optometrists are. (*See* Pl.'s Reply, ECF 40 at 2-5.) That distinction is irrelevant in determining whether she has sufficiently alleged materiality. Here, like in *Rockey*, Alejandro has not alleged facts showing the claims submitted under Dr. Brooks' NPI would not have been paid if they had included the NPI for the professional who actually provided the service.

8

Complaint refers to an optometrist whose license expired in 2014, she does not allege Defendants submitted claims for services that doctor performed after the expiration of his license.

In addition to not addressing whether Alejandro has sufficiently alleged falsity, causation or knowledge, the Court need not consider whether she is an "original source" of the information underlying her claims or whether her FCA conspiracy claim is barred by the intracorporate conspiracy doctrine.

B

"[D]ismissal of claims upon a motion for judgment on the pleadings can be with prejudice, if amendment would be futile, but there certainly is no categorical rule that judgment on the pleadings is per se with prejudice." *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 501 (E.D. Pa. 2014). If, consistent with this Memorandum and all FCA required elements, Alejandro can allege enough facts to state a claim, she may file an amended complaint on or before Monday August 16, 2021. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.")

An appropriate Order follows.

BY THE COURT:

 */s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.
