## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA AND
STATE OF PENNSYLVANIA
ex rel. ALISHA ALEJANDRO,

               *Plaintiffs / Relator,*

     v.

PHILADELPHIA VISION CENTER,
BARCO OPTICAL, INC., BRUCE RUBIN,
AND DR. BETH BROOKS,

            *Defendants.*

CIVIL ACTION
NO. 20-2027

**PAPPERT, J.**                                                    **February 1, 2022**

### MEMORANDUM

    Relator Alisha Alejandro believes Philadelphia Vision Center, Barco Optical, Inc., Bruce Rubin and Dr. Beth Brooks submitted to government healthcare programs false reimbursement claims for eye exams.  She sued them on behalf of the United States under the False Claims Act's *qui tam* provisions, 31 U.S.C. § 3279, *et seq.*[1]  "The FCA is meant 'to reach all types of fraud . . . that might result in financial loss to the Government.'"  *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003)).  But it "is not a means of imposing treble damages and other penalties for insignificant regulatory . . . violations."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176,

---

[1]     A private plaintiff like Alejandro – a relator – may bring a civil action to enforce the FCA on behalf of the United States and may receive a share of any recovery resulting from the action.  *See* 31 U.S.C. § 3730(b) &(d).  After she filed this action (ECF 1), the Government declined to intervene. (ECF 2.)  The relator has "the right to conduct the action" where the Government declines intervention.  *Id.* § 3730(c)(3).

196 (2016).  Four elements are required to state an FCA claim: "falsity, causation, knowledge, and materiality." *Petratos*, 855 F.3d at 487.

In her Amended Complaint, Alejandro alleges Defendants failed to comply with various regulatory requirements.  With the exception of one subset of claims however, she fails to adequately allege the violations were material to the Government's payment decisions.  The Court accordingly grants Defendants' motion in part and denies it in part.

I

A

Alejandro was Philadelphia Vision's patient.  (Am. Compl., ECF 43, ¶ 16.)  Dr. Brooks is a licensed optometrist who "is an independent contractor working for Vision Center and other locations."  (*Id.*  ¶ 22.)  Barco, which is owned by Rubin, is Philadelphia Vision's purported owner, though he is not a licensed healthcare provider or licensed optometrist.  (*Id.* ¶¶ 20-21.)  The Court previously granted Defendants' motion for judgment on the pleadings (ECF 25) because Alejandro had not pled enough facts to show the alleged billing scheme was material to any decision to pay submitted claims.  *United States ex rel. Alejandro v. Philadelphia Vision Ctr.*, No. 20-2027, 2021 WL 3051908, at *4 (E.D. Pa. July 20, 2021); *see also* (ECF 41, 42).  Specifically, she did not allege "the Government paid for any services that were not provided or for services provided by an unlicensed professional."  2021 WL 3051908, at *3.

Alejandro filed an Amended Complaint.  In Count I, she alleges Defendants violated 31 U.S.C. § 3729(a)(1)(A) because they "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval . . . ."  (Am. Compl. at

¶ 119.)  In Count II, she maintains they "knowingly made, used, or caused to be used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B)."  (*Id.* ¶ 123.)  She alleges that the United States, "unaware of the falsity of the claims and/or statements . . . and in reliance on the accuracy of those claims and/or statements, paid and may still be paying or reimbursing for optician and professional eye care for patients enrolled in Government programs."  (*Id.* ¶ 125.)  In Count IV, Alejandro asserts Defendants concealed, avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).  (*Id.* ¶ 133.)  Count III alleges Defendants conspired with each other to commit the acts alleged in Counts I, II and IV.  (*Id.* ¶ 128.)

B

Alejandro contends Defendants submitted claims:  (1) indicating incorrect provider data; (2) for eye exams performed without a license; or (3) for services performed at locations that were "unaffiliated" or not registered with the state board. Her allegations rely, in part, on information she contends her counsel obtained from "claims data maintained by the Pennsylvania Department of Human Services Program Integrity Department regarding all defendant [sic] claims submitted for payment of optometrist services including eye examinations."  (*Id.*, ¶ 19.)

1

Alejandro alleges Rubin submitted claims for Medicare/Medicaid reimbursement under certain optometrists' National Provider Identifier (NPI) numbers when a different optometrist provided care, "for years for multiple patients and on [a] regular basis . . . ."  (*Id.* ¶¶ 41-52.)  She cites her own visit to Philadelphia Vision as an example

of the billing practices she challenges as improper.  Even though Dr. Johnson examined

her eyes and Dr. Brooks "was not present," Barco submitted a request for

Medicare/Medicaid payment or reimbursement using Dr. Brooks' NPI number for

Alejandro's December 8, 2016 eye exam.  (*Id.*, ¶¶ 42, 44, 47.)  Although Alejandro

alleges Rubin "hand wrote and signed" Alejandro's prescription on Dr. Johnson's

prescription pad and handed" it to her (*id.* ¶ 43), she does not allege Dr. Johnson did

not perform her examination or that Dr. Johnson was not a licensed provider.

Alejandro's vision plan paid the claim for her exam on February 16, 2017.[2]  (*Id.* ¶ 46.)

Alejandro's allegations are based in part on Rubin's sworn testimony in a prior

civil suit she filed against Philadelphia Vision Center.[3]  Rubin did not deny he

submitted reimbursement requests using a single NPI number even if it did not

correspond to the optometrist who saw a particular patient.  He said he did so because

it was "much more simple to keep it all under one NPI number," so that when he did

the billing, "everything [wa]s billed under one account."  (*Id.* ¶¶ 52-53.)  During

discovery in the prior case Rubin contacted Superior Vision to explain he had "been

billing services under Dr. Brooks" alone because it was "more efficient" but said in the

---

[2]     According to Rubin, under a contract with Alejandro's vision plan, "payments are made in a fixed amount to Barco Optical, Inc. regardless of which doctor renders the service" and "neither [Alejandro] nor the vision plan sustained any financial loss" from the use of Dr. Brooks' NPI number instead of Dr. Johnson's.  (Am. Compl., ECF 43, ¶ 65.)

[3]     In her prior case, Alejandro alleged violations of the Pennsylvania Unfair Trade Practice and Consumer Protection Law, 73 Pa. Const. Stat. §§ 201-1, et seq., civil conspiracy, the Sherman Act, 15 U.S.C. §§ 1 & 2, and the Clayton Act, 15 U.S.C. §§ 4 & 16.  *Alejandro v. Philadelphia Vision Ctr.*, No. 18-2150, 2018 WL 4110554, at *2 (E.D. Pa. Aug. 29, 2018).  Rubin's deposition in the prior action is attached as Exhibit A to Alejandro's Amended Complaint and Defendants do not dispute its authenticity.  (Am. Comp., Ex. A, ECF 43-1.)  Because the Amended Complaint explicitly relies on the deposition, the Court may consider the transcript.  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

future he would log out and log back in "to separate the claims for each doctor's exams." (*Id.* ¶ 57.) Rubin asked whether Superior Vision required him to do so and sought "any written guidelines . . . to explain exactly how the billing should be done." (*Id.*)  In an affidavit prepared for the other case, Rubin explained Superior took no adverse action after he notified it of his billing practices.  (*Id.* ¶ 65.)  Instead, it offered "retraining on billing procedures to ensure that the correct coding was done on future submissions." (*Id.* (internal quotation omitted).)

2

Alejandro also contends Defendants violated the FCA by submitting two types of claims for eye exams allegedly performed by an unlicensed provider.  Philadelphia Vision submitted thirty-four claims for eye exams using Dr. Stuart Pollack's NPI number "as performing provider between January 21, 2016 [and] September 29, 2017" without his authorization.  (*Id.* ¶¶ 81, 88.)  However, Alejandro alleges Dr. Pollack "retired to Florida in 2012" and acknowledged "his license expired in 2014." (*Id.* ¶ 84; *see also id.* ¶ 49.)  When Alejandro's counsel interviewed Dr. Pollack, he said "he has not performed any eye exams since his license expired." (*Id.* ¶ 85.)  Rubin testified in 2018 that Dr. Pollack had not practiced for five or six years, meaning he would not have been working when the claims using his NPI number were submitted in 2016 and 2017. (*Id.* ¶ 89.)  Alejandro also refers to a "table summary" allegedly listing the claims data for claims submitted for Dr. Pollack's alleged exams.[4]  (Am. Compl., ¶ 83; *see also* Am.

---

[4]       Defendants characterize Alejandro's table summary exhibits as "self-created," "manufactured" and "cherry-picked." (Defs.' Mem., ECF 46-2 at 13 (emphasis, internal quotation and alteration omitted); see also *id.* at 6.)  In fact, the Court cannot determine they are undisputedly authentic representations of claims data maintained by the Pennsylvania Department of Human Services Program Integrity Department.  (*See* Am. Compl., ¶ 19.)  The Court can nonetheless consider the exhibits at this stage of the litigation because her Amended Complaint explicitly relies

5

Compl, Ex. C, ECF 43-3).

In addition, Alejandro alleges that between October 4, 2017 and June 19, 2020, Philadelphia Vision "submitted 86 claims for payment of 'eye exams' where the claim indicated Philadelphia Vision Center (NPI No. 1386654044) performed the physician service," rather than a specific optometrist. (*Id.* ¶¶ 77.) As purported proof, she cites another "table summary" exhibit listing the claims. (*Id.* ¶ 78; *citing* Am. Compl, Ex. B, ECF 43-2.) However, unlike with Dr. Pollack's purported exams, her Amended Complaint lacks any specific factual allegations about the circumstances surrounding the listed claims for exams purportedly performed by "Philadelphia Vision Center."

3

Finally, Alejandro challenges Defendants' submission of claims for exams associated with locations that were not registered with the state board or for services performed at "unaffiliated" locations.

Citing another table summary, she alleges Defendants sought reimbursement for numerous claims for eye exams using the address for a "warehouse for eye products" at 400 Lincoln Avenue, in Hatboro, Pennsylvania, an alleged "sham" clinic location that was not registered with the "State Board" where no "patients were ever seen . . . ." (*Id.* ¶¶ 102-103, 106-109, 112-113; *see also* Am. Compl., Ex. E, ECF 43-5; Am. Compl., Ex. F, ECF 43-6.) The billing provider listed on the table summary for these claims is Philadelphia Vision Center or Beth Brooks. (Am. Compl., Ex. E; Am. Compl. Ex. F.)

Another 660 claims listed in a table summary were allegedly submitted using

---

on them. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Dr. Brooks' NPI number for eye exams at a clinic at 1509 Chestnut Street, Philadelphia, another location not registered with the State Board.[5]  (Am. Compl. ¶¶ 95, 97; *see also* Am. Compl. Ex. D, ECF 43-4.)  Alejandro contends the Chestnut Street address was a "Dunkin Donuts" location (Am. Compl. ¶ 94), not an ophthalmologist's office, although she acknowledges Philadelphia Vision "previously operated a retail location" there.  (*Id.* ¶ 93.)

In addition, she alleges Rubin attested that "Philadelphia Vision Center (Barco Optical, Inc.) was "a single store location at 2536 Welsh Road, Philadelphia," but Philadelphia Vision submitted "441 individual eye exam claims" for a separate "unaffiliated" service location at "100 East Lehigh Avenue, Philadelphia."  (*Id.* ¶¶ 100-101.)  There is no accompanying table summary exhibit for these claims.

## II

To withstand dismissal, Alejandro's Amended Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Conclusory allegations do not suffice.  *Id.*

When an Amended Complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787

---

[5]     At least one claim on the relevant table summary exhibit lists "Philadelphia," and not Dr. Brooks as the billing provider.  (ECF 43-4 at ECF p. 11.)

(3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).  However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to" make them facially plausible.  *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (quoting *Connelly*, 809 F.3d at 786-87).

Because FCA *qui tam* actions are subject to Federal Rule of Civil procedure 9(b)'s heightened pleading standard, claimants must "allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014) (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  This requires a relator to allege "all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).  Rule 9(b) allows "[m]alice, intent, knowledge and other conditions of a person's mind" to "be alleged generally."  Fed. R. Civ. P. 9(b).  However, "describing a mere opportunity for fraud will not suffice."  *United States v. Omnicare, Inc.*, 903 F.3d 78, 91 (3d Cir. 2018).

III

Alejandro relies on several regulatory requirements applicable to Pennsylvania medical assistance program participants.  55 Pa. Code § 1101.42 requires providers to "be currently licensed and registered or certified or both by the appropriate State

agency . . . ." (*See* Am. Compl. ¶ 40.)  Under 55 Pa. Code § 1147.51, "[o]ptometric

services shall be billed in the name of the optometrist providing the service."  (*See* Am.

Compl. ¶¶ 36, 68.)  55 Pa. Code § 1147.41 provides that "optometrists are required . . .

to have the offices in which they practice registered with the State Board."  (*See* Am.

Compl. ¶ 37.)  In addition, the Federal Medicaid regulations require a State Medicaid

agency to "require all claims for payment for items and services that were ordered or

referred to contain the [NPI] of the physician or other professional who ordered or

referred such items or services."  42 C.F.R. § 455.440.  (*See* Am. Compl. ¶ 39.)

Alejandro argues her Amended Complaint can withstand dismissal because she "alleges

each of these requirements and asserts defendants submitted over 1100 individual

claims with false statements that explicitly or implicitly asserted the veracity of which

physician provided eye examination services, whether the provider of the physician

service was validly licensed and whether the clinic location was valid."  (Pl.'s Opp'n

Mem., ECF 51 at 7.)

      It is not enough, however, to allege a defendant misrepresented its compliance

with a regulatory requirement.  To be actionable under the FCA, "a misrepresentation

about compliance with a statutory, regulatory or contractual requirement must be

*material* to the Government's payment decision . . . ."  *Escobar*, 579 U.S. at 192

(emphasis added).  "[S]tatutory, regulatory, and contractual requirements are not

automatically material . . . ."  *Escobar*, 579 U.S. at 191.  "[T]he Government's

designation of compliance with a particular regulatory requirement as a condition of

payment is relevant to, but not dispositive of, materiality."  *United States v.

International Bhd. of Elec. Workers Loc. Union No. 98*, 5 F. 4th 315, 343 (3d Cir. 2021)

(citation omitted).

"The materiality standard is demanding.  The False Claims Act is not 'an all-purpose anti-fraud statute,' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).  It is not the Court's job to use "the FCA to enforce regulatory provisions that the regulatory agencies themselves have chosen either [to] not enforce or to enforce more delicately." *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 320 (E.D. Pa. 2017).  An FCA materiality inquiry "is a holistic, totality-of-the-circumstances examination of whether the false statement has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 342 (3d Cir. July 13, 2021) (quoting 31 U.S.C. § 3729(b)(4)).  A misrepresentation is material if it goes to the very essence of the bargain.'" *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5).  Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (alteration in original).

For Alejandro's claims to proceed to discovery, she must allege Defendants misrepresented compliance with regulatory "requirements that are so central to the provision of [optometric care] that the [Government] would not have paid [the submitted] claims had it known of these violations." *Escobar*, 579 U.S. at 196.  It is not enough to show "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.  Noncompliance must be more than "minor or insubstantial . . . ." *Id.*  Only one category of Alejandro's allegations satisfies

these requirements.

## A

Alejandro's Amended Complaint fails to allege facts which could plausibly show that her claims based on bills using incorrect NPI numbers meet the FCA's materiality requirement.  Although 42 C.F.R. § 455.440 requires claims for payment to contain the NPI of the "professional who ordered or referred such items or services," Defendants' regulatory noncompliance, without more, is not material.  Alejandro alleges only that bills were coded with incorrect NPI numbers as the result of Rubin's practice of failing to log out and log back into the billing system.  She does not allege any facts to show any of the incorrectly coded claims would not have been paid if the correct optometrist's NPI number had been used instead.  Nothing in the Amended Complaint would permit the Court to infer that "Congress intended conduct such as this to morph into an actionable fraud against the government." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 765 (3d Cir. 2017).  In the absence of allegations that the Government paid for services that were not provided, Rubin's sloppy or lazy billing practices did not improperly "influence the 'payment or receipt of money'" for these claims.[6] *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 822 (N.D. Ill. 2015) (quoting 31 U.S.C. § 3729(b)(4) (emphasis omitted)).

Considering similar facts in *Spay*, the Third Circuit held the use of "dummy Prescriber IDs" to submit prescription claims did not sufficiently allege materiality where the dummy IDs "were intended as a technical, formulaic way of preventing a

---

[6]     Indeed, Alejandro alleges she received her eye examination and prescription from a licensed optometrist, albeit not from the individual who was identified on the claim submitted for her visit. (Am. Compl., ¶¶ 42-43.)

computer program from denying legitimate claims for reimbursement and payment for prescriptions that were actually disbursed to Medicare recipients" and "[t]he claims themselves were neither false nor fraudulent."  875 F.3d at 765 (3d Cir. 2017).

The relator's similar claims in *Rockey* also "founder[ed] on materiality."  92 F. Supp. 3d at 822.  She alleged the defendant submitted claims for audiologists' services using a physician's NPI, but the claims were "limited to those for which Medicare would have reimbursed the Ear Institute even if the audiologists' NPIs had been listed on the claims forms."  *Id.*  The claims' alleged falsity "was not material" "because the government would have paid [them] regardless of whose NPI was on the form."  *Id.*

Materiality was also lacking in *United States ex rel. O'Laughlin v. Radiation Therapy Services, P.S.C.*, where the relator alleged "that the particular physician named on certain claims did not actually supervise those services . . . ." 497 F. Supp. 3d 224, 237 (E.D. Ky. 2020).  The relator did "not allege that the identified services were not supervised by any physician" and Medicare's obligation to pay for the services was not impacted by "whether the particular named physician . . . was actually the physician . . . so long as they were directly supervised by a physician . . . ."  *Id.* (emphasis omitted).  The court held the relator had "not provided sufficient factual detail from which the court could reasonably infer that by alleging a certain physician did not supervise services, *no physician* supervised those services."  *Id.* at 238 (emphasis in original).

Alejandro's amendments add nothing new to distinguish her NPI number claims from these cases or to make plausible her claims in Counts I and II based on the use of incorrect provider data.

B

1

Alejandro, however, has met the FCA's materiality requirement with respect to her 31 U.S.C. § 3729(a)(1)(A) and (B) claims (Counts I and II) against Philadelphia Vision, Barco and Rubin based on thirty-four eye exam claims allegedly submitted between January 2016 and September 2017 using the National Provider Identifier (NPI) number for Dr. Pollack after his license had expired and he had retired.[7] The Court dismissed Alejandro's Complaint in part because she had not alleged that services were provided by an optometrist whose license had expired. *United States ex rel. Alejandro v. Philadelphia Vision Ctr.*, No. 20-2027, 2021 WL 3051908, at *4 (E.D. Pa. July 20, 2021). Now she has. (*See* Am. Compl. ¶¶ 81, 88; *see also* Am. Compl, Ex. C, ECF 43-3.)

Alejandro's allegations about the claims in Dr. Pollack's name are now more akin to those found to be material in *United States v. Mount Sinai Hospital*, No. 13-4735, 2015 WL 7076092, at *11 (S.D.N.Y. Nov. 9, 2015). There, the court permitted the relator to proceed on allegations of "doctor swapping." The complaint alleged "the doctors who rendered the medical treatment in at least six of the 'doctor-swapping' examples were not eligible to bill Medicare." *Id.* The FCA's materiality requirement was met because "[s]wapping the name of an eligible doctor for an ineligible one would have a natural tendency to influence, or be capable of influencing, the payment or receipt of money." *Id.* (citation and internal quotation omitted). If Dr. Pollack performed services after his license had expired, the Government may not have

---

[7]     These claims do not implicate Dr. Brooks.

reimbursed for them.

The alleged claims submitted under Dr. Pollack's name after he retired and his license expired are the types of "half-true statements" that *Escobar* deemed to be actionable. "[R]epresentations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Escobar*, 579 U.S. at 188. In *Escobar*, a provider submitted claims for payment using payment codes corresponding to specific services, but the representations "were clearly misleading in context." *Id.* The Supreme Court explained the claims were actionable misrepresentations because they used "payment and other codes" to convey information about services provided without disclosing "many violations of basic staff and licensing requirements . . . ." *Id.* at 190. Here, the omitted "critical qualifying information" is that Dr. Pollack's license was expired when he allegedly performed the exams.

To receive payment, practitioners providing medical care to Medical Assistance recipients must be licensed. 55 Pa. Code § 1101.51 ("Payment will not be made when the Department's review of a practitioner's medical records reveals instances where these standards have not been met."). Eye exams performed by a licensed optometrist are the "'very essence of the bargain,'" and if Dr. Pollack performed exams when he was not licensed, the government did not receive the benefit of its bargain. *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5). The Amended Complaint alleges he did not have a license at the relevant time. Alejandro contends Pollack was unlicensed when he supposedly conducted the examinations and the Government would have refused to reimburse Defendants for the claims submitted using Dr. Pollack's NPI number between 2016 and 2017 had it known that.

14

2

In contrast, Alejandro's allegations regarding claims submitted for eye exams indicating that "Philadelphia Vision Center . . . performed the physician service" are not supported by enough facts to meet the FCA's materiality requirement.  (Am. Compl. ¶ 77.)  While, like the claims involving Dr. Pollack, she alleges exams were performed without a license, Alejandro's assertions with respect to the Philadelphia Vision Center are too conclusory.  She relies entirely on information in the attached table ostensibly summarizing exams with Philadelphia Vision Center listed as the "Performing Provider Name."  (*Id.* ¶ 77-78; *see also* Am. Compl, Ex. B, ECF 43-2.)  Absent additional factual allegations about the circumstances around the listed claims, Alejandro has not provided the required "reliable indicia" to create a "strong inference" that they represent false claims that were "actually submitted."  *Foglia*, 754 F.3d at 155.

Although Alejandro has shown the claims listed in the relevant tables were not assigned to a licensed optometrist when they were billed, she alleges no facts to show those claims were for exams performed by unlicensed providers (or for exams that were never performed).  She does not set forth "particular details" about any "scheme" to submit false claims.  *Id.*  While the Court may at this stage consider the table purportedly summarizing exams performed by Philadelphia Vision Center, "merely attaching exhibits is insufficient to meet the requirement that a complaint contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Cartwright v. LVNV Funding LLC*, No. 22- 0098, 2022 WL 206172, at *4 (E.D. Pa. Jan. 24, 2022).

C

When considering the "totality of circumstances," Alejandro also fails to state a claim under the FCA for the claims that were allegedly submitted for exams at 400 Lincoln Avenue, 1509 Chestnut Street or 100 East Lehigh Avenue.  First, as with the claims pertaining to Philadelphia Vision Center, these claims largely rely on information listed in tables and are unsupported by specific factual allegations about the circumstances surrounding the alleged exams.  (*See* Am. Compl. ¶¶ 96, 101, 103; *see also* Am. Compl. Exs. D, E and F.)  The conclusory allegations in Alejandro's Amended Complaint about bills for exams performed at unregistered or "unaffiliated" addresses lack any "reliable indicia" leading to a strong inference that bills were submitted for exams actually performed at these locations.  *Foglia*, 754 F.3d at 155.

Second, Alejandro has not shown the addresses accompanying the claims go to the "very essence of the bargain" – i.e., provision of an eye exam.  *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 346 (3d Cir. 2021) (quoting *Escobar*, 579 U.S. at 193 n.5).  Neither the tables nor the Amended Complaint's allegations tend to show these claims were for exams that were never performed.  Nothing in the Amended Complaint provides "particular details of a scheme" to submit claims for false exams at "sham" locations.  *Foglia*, 754 F.3d at 155.

Third, while 55 Pa. Code § 1147.41 requires optometrists "to have the offices in which they practice registered with the State Board," (*see* Am. Compl. ¶ 37), Alejandro has not alleged facts showing whether the Government pays or declines to pay claims when it has "actual knowledge" that this requirement has been violated.  *See Escobar*, 579 U.S. at 194-95 ("[P]roof of materiality can include, but is not necessarily limited to,

evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement"). A holistic review of the allegations in the Amended Complaint does not reveal the claims for exams at 400 Lincoln Avenue, 1509 Chestnut Street or 100 East Lehigh Avenue to be the result of anything other than "minor or insubstantial" noncompliance with the requirements of 55 Pa. Code § 1147.41.

D

The claims pertaining to exams Dr. Pollack allegedly performed in 2016 and 2017 may go forward because, in addition to being material, Alejandro has alleged enough facts to meet the FCA's falsity, causation and knowledge requirements.

Claims that misrepresent goods or services provided are factually false. *See U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). Claims that knowingly and falsely certify compliance with a statute or regulation that is a condition for Government payment are legally false. *Id.* FCA liability can attach for either type of false claim. *See United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh, Pa.*, 728 F. App'x 101, 106 (3d Cir. 2018). Moreover, falsity may be premised on an express statement or an omission. *Escobar*, 579 U.S. at 187-88. Alejandro's allegations concerning services allegedly provided by Dr. Pollack after he retired support a plausible inference of falsity because either he did not perform the exams billed under his name or, if he did, did so without a license.

Alejandro alleges Philadelphia Vision, Barco and Rubin's conduct caused the alleged false claims concerning Dr. Pollack to be presented and caused alleged false

statements to be made about the exams.  31 U.S.C. § 3729(a)(1)(A), (B).  Rubin was responsible for submitting claims for Barco and Philadelphia Vision.  In Alejandro's prior civil suit, he testified that when seeking an insurance payment after an exam, he would put the exam information "in a folder.  And when I get a chance, I bill it. . . .  The procedure is, I put it in a file, okay, and then I bill it and then I put it away.  And when I get paid, I check it off."  (Am. Compl., Ex. A, ECF 43-1 at 111:23-112:7.)  Rubin owns Barco and Barco owns Philadelphia Vision.  (Am. Compl. ¶¶ 20-21.)  The Amended Complaint includes enough information about Rubin's billing practices and his relationship with Barco and Philadelphia Vision to plead causation.

"Knowingly" means a defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  § 3729(b)(1)(A).  Knowledge only needs to "be alleged generally."  Fed. R. Civ. P. 9(b).  As recounted in the Amended Complaint, Rubin's prior testimony that he knew Dr. Pollack had not been practicing during the time relevant to the claims billed under his name is enough to allege he, Philadelphia Vision and Barco acted "knowingly" for purposes of 31 U.S.C. §§ 3729(a)(1)(A)–(B).

E

In Count IV, Alejandro alleges Defendants are liable for "reverse false claims" under 31 U.S.C. § 3229(a)(1)(G) because they did not "report and refund overpayments" resulting from the conduct that gives rise to her claims under §§ 3729(a)(1)(A) and (B).  (Am. Compl. ¶ 131.)  But "relators may not use § 3729(a)(1)(G) as a 'redundant basis' for liability."  *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 280-81 (E.D. Pa.

2020).  "[C]laims alleging only that defendants wrongfully retained fraudulently obtained funds are not cognizable because such claims 'merely duplicate[ ]' affirmative FCA claims."  *United States ex rel. Mbabazi v. Walgreen Co.*, No. 19-2192, 2021 WL 4453600, at *7 (E.D. Pa. Sept. 28, 2021) (alteration in original) (quoting *Sturgeon*, 438 F. Supp. 3d at 280-81).  Alejandro's claim under § 3229(a)(1)(G) is dismissed because it "merely recasts [her] §§ 3729(a)(1)(A) and (B) claims . . . ."  *Sturgeon*, 438 F. Supp. 3d at 281.

F

The intracorporate conspiracy doctrine bars Alejandro's claim under Section 3729(a)(1)(C) (Count III).  (Defs.' Mem., ECF 46-2 at 21.).  To begin, her FCA conspiracy claim is contingent on a violation "of subparagraph (A), (B), . . . [or] (G)."  31 U.S.C. § 3729(a)(1)(C).  "Without an underlying violation, there can be no liability for conspiracy under the FCA."  *United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 317 n.3 (D.N.J. 2015), aff'd on other grounds, 855 F.3d 481 (3d Cir. 2017).

The doctrine stands for the proposition that "an entity cannot conspire with one who acts as its agent."  *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313-14 (3d Cir. 2003) (citation omitted).  Regardless of Dr. Brooks's relationship to the other Defendants, the allegations in the Amended Complaint do not implicate her in the claim concerning Dr. Pollack's alleged examinations.  As for Rubin, Barco and Philadelphia Vision, any agreement that may have existed between them regarding the claims involving Dr. Pollack would have been made with "complete unity of interest under one corporate consciousness."  *See United States v. Medco Health Sys., Inc.*, No. 12-522, 2014 WL 4798637, at *12 (D.N.J. Sept. 26, 2014); *see also Copperweld Corp. v.*

19

*Independence Tube Corp.*, 467 U.S. 752, 771 ("A parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.").

G

The FCA's public disclosure bar requires the Court to dismiss claims "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . from the news media."  31 U.S.C. § 3730(e)(4)(A)(iii).  Defendants argue that Alejandro's allegations "were widely spread on internet websites available to the public, which constitutes a public disclosure under the 'news' media exception." (Defs.' Mem. at 22.)  They rely specifically on Judge Bartle's August 29, 2018 opinion in *Alejandro v. Philadelphia Vision Center* and argue it was published "on various media websites on the internet[.]"  (*Id.* at 23); *see also Alejandro*, 2018 WL 4110554.

Even if the cited websites are "news media" within the meaning of the FCA, something the Court need not decide, Judge Bartle's decision had nothing to do with claims attributed to a retired or unlicensed optometrist, be it Dr. Pollack or anyone else. To the extent Alejandro's Amended Complaint pertains to bills submitted in Dr. Pollack's name, it is not "based on" allegations that were disclosed in Judge Bartle's decision and the public disclosure bar does not provide a basis for dismissing them.  *See U.S. ex rel. Feldstein v. Organon, Inc.*, 364 F. App'x 738, 741 (3d Cir. 2010) (holding that a qui tam action is "based upon" publicly revealed allegations if they are "supported by" or "substantially similar to" disclosed allegations and transactions).

Because Defendants have not shown Alejandro's allegations were "based upon"

20

public disclosures, the Court need not consider whether she qualifies for the "original-source" exception to the public disclosure bar. *See United States v. Omnicare, Inc.,* 903 F.3d 78, 94 n.12 (3d Cir. 2018) (finding it was not necessary to reach the question of whether the relator qualified for the FCA's "original source" exception when the relator's allegation was not publicly disclosed).

Alejandro has not asked for leave to amend a second time and there is no reason to again allow her to do so. *See* Fed. R. Civ. P. 15(a)(2).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.